UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

ERIC ANTHONY NEPUTE,
individually, and as
Owner of Quickwork LLC; and

QUICKWORK LLC,
a limited liability company,
also d/b/a WELLNESS WARRIOR,

Defendants.

Case No.: 4:21-cv-00437-RLW

**DEFENDANT DR. NEPUTE'S OPPOSITION TO PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT OF LIABILITY FOR 12,859,355 VIOLATIONS OF THE FEDERAL TRADE COMMISSION ACT AND 10,175,234 VIOLATIONS OF THE COVID-19 CONSUMER PROTECTION ACT**

## TABLE OF CONTENTS

INTRODUCTION……………………………………………………………………………….1

BACKGROUND……………………………………………………………………………...5

ARGUMENT………………………………………………………………………………...7

I. Plaintiff's Motion is a Procedurally Improper Attempt to Shift the Burden of Proof onto Defendants and the Court……………………………………7

II. Plaintiff Fails to Establish a Lack of Material Dispute as to Core Matters of Fact…………......10

A. Plaintiff Has Not Shown that the Disputed Content are Advertisements………………..10

B. Plaintiff Fails to Establish that the Disputed Content's Net Impression is Factually Indisputable…………………………………………………………………14

C. Plaintiff Has Not Shown as a Matter of Law that the Disputed Content Lacked Adequate Substantiation.……………………………………………………...19

D. Issues of Fact Preclude Summary Judgment as to Quickwork's Emails………..………22

III. Plaintiff Has Not Carried its Burden to Show that Civil Penalties are Appropriate or that Defendants Violated the COVID-19 Act 10,175,234 times……………24

A. Undisputed Evidence Demonstrates that Defendants Lacked the Requite Mens Rea for Civil Penalties……………………………………..………………....24

B. Even if Civil Penalties Were Appropriate, Plaintiff has Not Demonstrated 10,175,234 Violations of the COVID-19 Act…………………………………………26

CONCLUSION……………………………………………………………………………...29

## TABLE OF AUTHORITIES

### CASES

*Bayes v. Biomet, Inc.*,
2021 WL 3330911, *8 (E.D.Mo. 2021)……………………………………………………...20

*Beneficial Corp. v. Federal Trade Comm'n*,
542 F.2d 611, 617 (3d Cir. 1976)…………………………………………………………15

*Bolger v. Youngs Drug Products Corp.*,
463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983)………………….……...11

*CBS Corp. v. F.C.C.*,
663 F.3d 122 (3d Cir. 2011)……………………………………………………………..…26

*Crossley v. Georgia-Pac. Corp.*,
355 F.3d 1112, 1114 (8th Cir. 2004)……………………………………………………...…9

*Elliott v. Elliott*,
49 F.R.D. 283, 284 (S.D.N.Y. 1970)………………………………………………………10

*Espinola v. Ingersoll Rand Co.*,
No. 4:09CV02090 HEA, 2012 WL 760905, at *1 (E.D. Mo. Mar. 8, 2012)…………………..8

*F.T.C. v. Affiliate Strategies, Inc.*,
No. 09-4104-JAR, 2010 WL 11470103, at *9 (D. Kan. June 8, 2010)………………………..11

*F.T.C. v. Connelly*,
No. SACV 06-701 DOC RNBX, 2006 WL 6267337, at *11 (C.D. Cal. Dec. 20, 2006)……17

*F.T.C. v. Direct Mkg. Concepts, Inc.*,
569 F. Supp. 2d 285, 310 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010)…………………..22

*F.T.C. v. DIRECTV, Inc.*,
No. 15-CV-01129-HSG, 2018 WL 3911196, at *7 (N.D. Cal. Aug. 16, 2018)……………….18

*F.T.C. v. Johnson*,
96 F. Supp. 3d 1110, 1121 (D. Nev. 2015)……………………………………………….15, 19

*F.T.C. v. Nat'l Urological Grp., Inc.*,
645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009)………15

*F.T.C. v. Pantron I Corp.*,
33 F.3d 1088, 1095 (9th Cir. 1994)……………………………………………...………10

*Fish v. United States*,
748 Fed.Appx. 91, 92 (8th Cir. 2019)……………………………………………………..19

*Hunton v. American Zurich Ins. Co.*,
2018 WL 1182552, * 6 (D. Ariz. 2018)………………………………………………..9

*Keithly v. Intelius Inc.*,
764 F. Supp. 2d 1257, 1266 (W.D. Wash. 2011)……………………………………...…15

*Kutten v. Bank of Am., N.A.*,
No. 06-0937 PAM, 2007 WL 2485001, at *11 (E.D. Mo. Aug. 29, 2007)………………….…9

*McGhee v. Pottawattamie County, Iowa*,
547 F.3d 922, 929 (8th Cir. 2008)…………………………………………………………20

*New York Times v. Sullivan*,
376 U.S. 254, 265-66, 84 S.Ct. 710, 718-19, 11 L.Ed.2d 686 (1964).………………………..11

*Police Department v. Mosley*,
408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972)……………………………..11

*R.A.V. v. City of St. Paul, Minn.*,
505 U.S. 377, 422, 112 S.CT. 2538, 2564, 120 L.Ed.2d 305 (1992)…………………………14

*Roberts v. Browning*,
610 F.2d 528, 536 (8th Cir. 1979).………………………………………………………10, 19

*Rosemann v. St. Louis Bank*,
No. 14-CV-983-LRR, 2015 WL 13546678, at *14 (E.D. Mo. Nov. 17, 2015), *aff'd*, 858 F.3d 488 (8th Cir. 2017) ………………………………………………………………………9

*United States v. Alvarez*,
567 U.S. 709, 728 (2012).…………………………………………………………………14

*United States v. Dunkel*,
927 F.2d 955, 956 (7th Cir. 1991).………………………………………………………9

*United States v. Hopkins Dodge, Inc.*,
849 F.2d 311, 314 (8th Cir. 1988).………………………………………………………25

*Virginia State Bd. of Pharmacy v. Virginia Citizens Cons. Council, Inc.*,
425 U.S. 748, 762 (1976)………………………………………………………………..11

**STATUTES/RULES**

Federal Trade Commission Act
15 U.S.C. § 45(m)(1)(A) ............................................................10, 24, 26, 27
15 U.S.C. § 52 ..................................................................................10

Federal Rules of Civil Procedure
Fed. R. Civ. P. § 56(c)(1)(A)..................................................................8

Eastern District of Missouri Local Rules
E.D.Mo. L.R. 4.01(E)..........................................................................8

**SECONDARY SOURCES**

FTC Policy Statement on Deception, 103 F.T.C. 110 (1984)..........................................15

## INTRODUCTION

Plaintiff's motion for partial summary judgment is the latest example of government overreach. On the basis of Facebook videos, emails sent to Defendant Quickwork, LLC's[1] subscribers, and Dr. Nepute's political radio show on Real Talk 93.3, The Voice of Freedom, Plaintiff seeks summary judgment on over 10 million purported violations of the COVID-19 Consumer Protection Act (the "COVID-19 Act"), plus another 12 million violations of the FTC Act. Plaintiff would deprive Defendants of a trial on the merits and instead summarily impose civil penalties with a maximum in excess of $500 billion, exceeding the gross domestic product of Austria, Nigeria, and all but 25 nations.

Despite seeking to impose such draconian penalties, Plaintiff submits a memorandum in support only fifteen pages long, less than half of which is devoted to argument. Plaintiff achieves such brevity through sweeping, conclusory statements—supported by citations that individually cite to 400 or more paragraphs of its 735 paragraph, 200-plus page Statement of Undisputed Fact ("SUF"). *See* Pl.'s Mem. at 3-4 (citing "SUF ¶¶ 60-490" and "SUF ¶¶ 491-731"). On the basis of a few lines of cherry-picked excerpts, Plaintiff asks the Court to decide the net impression of 64 videos, emails, and radio show broadcasts (many of which are not transcribed) totaling over 36 hours in length (the "Disputed Content"). Plaintiff's tactic is by no means summary in nature and improperly shifts the burden of identifying and applying the relevant facts to Defendant and the Court. Nor is it more efficient than simply allowing a jury[2] to properly decide net impression on the basis of the Disputed Content's entirety.

---

[1] Defendant Quickwork, LLC ("Quickwork") recently entered into a settlement agreement with Plaintiff. Defendant Quickwork was the entity that registered the fictitious name "Wellness Warrior". Dr. Nepute created the Wellness Warrior brand for health and wellness products in connection with Nepute Wellness Centers ("NWC") years prior the formation of Quickwork.

[2] This is especially true in light of Plaintiff's concession that it is not seeking summary judgment on Vitamin D issues. There will be a trial in this case. Pl's Mem. at 1, fn. 1.

Plaintiff's motion is substantively unavailing as it fails to demonstrate an absence of disputed facts in at least three ways:

First, Plaintiff fails to meet its burden of demonstrating that the Disputed Content are advertisements as a matter of law. In most instances the Disputed Content touches upon politics or the response of local, state, and federal governments to the pandemic, political speech that receives the highest level of First Amendment protection. Indeed, Plaintiff spends only a solitary paragraph on this threshold issue, making the circular argument that Defendant's speech must be commercial because Quickwork is a commercial entity. Commercial entities can, of course, engage in protected speech. And no regard is given to Dr. Nepute and his individual status and right to political speech.

Second, Plaintiff fails to show an absence of material fact as to the Disputed Content's net impression. As Plaintiff readily admitted in its discovery responses, the Disputed Content must be "judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context." Plaintiff, however, selectively excises snippets of videos and other content which otherwise are up to two hours in length. In so doing, Plaintiff attempts to justify completely untenable readings of the Disputed Content.

Third, even if Defendant made the alleged statements, Plaintiff fails to prove that Defendant lacked adequate substantiation as a matter of law. Vitamin D's anti-viral effects are well-recognized in the scientific community, including by its most prominent members. Dr. Anthony Fauci, when asked about vitamin D supplementation in the context of the COVID-19 pandemic, stated: "If you are deficient in vitamin D, that does have an impact on your susceptibility to infection. So I would not mind recommending, and I do it myself, taking vitamin D supplements." Indeed, the National Institute of Health (NIH) affirmatively states, "Your immune

system needs vitamin D to fight off invading bacteria and viruses." *See* DX X [ods.od.nih.gov/factsheets/VitaminD-Consumer/ (last visited November 8, 2022)]. Dr. Michael Holick, one of the world's leading vitamin D researchers whose opinions Plaintiff leaves unchallenged, testified that Defendants' statements are supported by competent and reliable scientific evidence. Multiple studies have called for vitamin D supplementation, as has the Department of Defense, which directed clinicians to "[e]nsure patients deficient in Vitamin D and Zinc are properly supplemented" when treating COVID-19. Accordingly, Plaintiff has conceded at a minimum that factual issues preclude summary judgment as to alleged statements about Vitamin D and Covid-19.

With respect to zinc, Plaintiff does not contest the substance[3] of the expert testimony provided by Dr. Christina Parks and Dr. Nepute, but rather rests entirely on its *Daubert* motion. As set forth in Defendants' opposition to that motion, both are qualified to render their opinions regarding the scientific substantiation for zinc.

To the extent Defendants even made the purported comparisons between vitamin D and zinc efficacy and the COVID-19 vaccines, as explained by Drs. Park, Holick, and Nepute, they are supported by competent and reliable scientific evidence[4]. Contrary to original promises, the vaccines have not successfully prevented infection or symptomatology. Recognizing the vaccines'

[3] Much like vitamin D, the NIH affirmatively states, "Zinc is a nutrient that people need to stay healthy…It helps your immune system fight off invading bacteria and viruses." *See* DX Y [ods.od.nih.gov/factsheets/Zinc-Consumer/ (last visited November 8, 2022)].

[4] In the instant motion, Plaintiff wishes to avoid the threshold issue of whether there is any scientific substantiation for Dr. Nepute's statements. Instead, Plaintiff relies on its *Daubert* motion to prevent Dr. Parks and/or Dr. Nepute from testifying regarding the scientific basis for their statements. By doing this, Plaintiff believes that Dr. Nepute could not offer any evidence that his statements are supported by competent and reliable scientific evidence. This meat-axe approach obviates the need to recite substantiation evidence.

limitations, the CDC revised its guidance to state that the vaccines primarily prevent "serious illness" as opposed to any illness. Furthermore, concerns over serious adverse effects from the vaccines exist. *See e.g.* DX T. The Florida Department of Health "**now recommends against the COVID-19 mRNA vaccines for males ages 18-39 years old**." *See* DX Z.

It is this last point that is lost in Plaintiff's mischaracterization of Defendants' statements. Vitamin supplementation and vaccination are not mutually exclusive alternatives—indeed vaccines were not generally available until over a year into the pandemic. Dr. Nepute consistently told listeners to get the COVID-19 vaccine if they desired, but to do so with informed consent and/or after speaking to their physician. And he espoused the benefits of vitamin supplementation regardless of vaccination status to boost an individual's immune system. But such points are lost when Plaintiff selectively excerpts the Disputed Content. This reinforces why the Disputed Content must be viewed in its totality to properly assess its context.

Finally, perhaps the most egregious example of Plaintiff's overreach is the basis on which it seeks civil penalties. As set forth in Defendants' motion for summary judgment, Plaintiff seeks civil penalties only under the COVID-19 Act. It is undisputed that neither Defendant knew of the Act until March 30, 2021, only weeks prior to the filing of the Complaint. It is also undisputed that the March 30 notice did not identify conduct by Dr. Nepute that allegedly violated the Act. It is also undisputed that some of the conduct that Plaintiff seeks relief for occurred prior to the COVID-19 Act's enactment. Finally, it is undisputed Defendants promptly removed the Content after the Lawsuit was filed.[5] Incredibly, Plaintiff pursues financially ruinous civil penalties on this record.

[5] The only possible exception is the "Radio Show" content. The content of the radio show is owned by the radio station. DSUF ¶ 43. Dr. Nepute does not maintain any control in the manner in which the radio station markets or distributes the show. DSUF ¶ 44. Thus, Dr. Nepute cannot cause the removal of the radio show recordings from any media. *Id*.

Summary judgment is wholly inappropriate based on the record presented. A trial will allow the jury to properly determine the Disputed Content's net impression based on its totality and determine the weight given to the parties' competing expert testimony. As more fully set forth below, Plaintiff fails to meet its burden and its motion should be denied.

## BACKGROUND

Dr. Eric Nepute is the owner of Nepute Wellness Center (NWC), a chiropractic and health wellness firm he established after receiving his doctorate from Logan University in 2006. His knowledge is not just limited to his doctorate, but he is also credentialed as a Certified Nutrition Specialist and holds a certification in a diplomat program in internal health. Dr. Nepute sees patients for a broad spectrum of health services and his work includes developing nutritional and supplementation care plans involving a multitude of vitamins and nutrients. Well prior to the COVID pandemic, Dr. Nepute sold vitamins and dietary supplements through the Wellness Warrior brand to his patients at NWC.

In addition to his medical and nutritional background, through his radio shows and public speaking engagements, Dr. Nepute regularly speaks on political issues including issues and the intersection of healthcare and public policy. He aims to positively influence public opinion and help shape the debate, and ultimate solutions, to issues impacting individual health both in America and abroad. To that end, Dr. Nepute hosts a radio show on the conservative talk radio station Real Talk 93.3 and is a renowned speaker who is currently part of a national speaking tour, a tour whose speakers have included Eric Trump and Alan Keyes.

As to the products at issue, the demand for the Wellness Warrior products became so great that Dr. Nepute decided it would be more efficient to have a separate business entity help market, sell, and handle the logistics associated with a wider distribution of nutritional supplements

previously offered to his patients through NWC. In early December 2019 Dr. Nepute along with two friends – Pastor Joseph Wood and Ryan Wilcox - he first met at church started Quickwork, LLC to handle this demand. Quickwork's genesis predates the onset of the pandemic and it was not formed in response to the pandemic. Quickwork's mission statement is to "Make more people less sick" and, to that end, they provide educational services and other products, including vitamin supplements, via the internet. On Quickwork's website visitors can do far more than just purchase nutritional supplements - they can view educational videos and other materials, obtain recommendations regarding a variety of products (some of which Dr. Nepute does not own and does not receive anything for recommending), sign-up for the email list, and obtain products for the cost of shipping and handling. The website also includes a "Blog" section that covers such topics as self-improvement, "life hacks", food and drink, and healthy recipes, and tutorials on such diverse issues as microplastics and GMOs. DSUF[6] ¶¶ 16–17.

As part of his outreach, Dr. Nepute records and posts videos on his Facebook account. This was Dr. Nepute's practice well prior to the COVID-19 outbreak. Dr. Nepute's videos were not scripted, but rather wide-ranging discussions covering not just the benefits of vitamin supplementation, but a number of topics, including politics, health policy, and individual healthcare and nutrition. In some of the videos, Dr. Nepute espoused the benefits of vitamin D and zinc as a means to "boost" or "strengthen" the immune system's anti-viral response, regardless of whether the relevant virus causes the common cold, the flu, or COVID-19. Ample scientific literature exists that supports Dr. Nepute's statements that vitamin D and zinc boost and strengthen the immune system to assist in the immune system's anti-viral response. Dr. Nepute even quotes

[6] Citations to "DSUF" are to Defendants' Statement of Additional Undisputed Material Facts" and "SUF Resp." are to Defendants' Response to Plaintiff's Statement of Undisputed Fact. Both are contained in the same document filed contemporaneously herewith.

excerpts from these studies in his videos. Notwithstanding Plaintiffs conclusory statement that Defendants marketed Vitamin D and Zinc as drugs, Dr. Nepute has not promoted vitamin D or zinc as a preventative or treatment for COVID-19, much less as a cure. DSUF ¶ 46; DX C (Nepute Decl.) at ¶ 8.

These videos would be re-posted across various Quickwork social media accounts. DSUF ¶ 28. Quickwork outsourced the marketing, advertising, and supply chain duties to Jaycox Brands, LLC. DSUF ¶ 29. Pastor Joseph Woods signed the master services agreement on behalf of Quickwork while Ryan Jaycox signed it on behalf of Jaycox Brands. DX D (Jaycox Tr.) at 35:1-10. Jaycox Brands and Pastor Joseph Woods created emails' content directing the recipients (people who subscribed to receive emails from Quickwork) to these videos. DSUF ¶ 30. Defendant Dr. Nepute did not have control of nor even saw the marketing materials, including emails, prior to their disbursement. DSUF ¶ 31. Dr. Nepute did not have access to the email account that sent the emails at issue. DSUF ¶ 32. The emails were not sent to Dr. Nepute for approval prior to them being sent to the subscriber list. DSUF ¶ 33.

Plaintiff now takes issue with the content of the videos, the emails over which Dr. Nepute exercised no control, and Dr. Nepute's political radio show seeking to impose civil penalties with a maximum in excess of <u>$500 billion.</u>

## ARGUMENT

### I. <u>Plaintiff's Motion is a Procedurally Improper Attempt to Shift the Burden of Proof onto Defendants and the Court.</u>

Though Plaintiff seeks a finding of liability against Defendants for more than <u>22 million</u> violations of the FTC Act and COVID-19 Act, its Memorandum substantively analyzes only a single video posted on April 8, 2021. *See* Pl.'s Mem. at 4-5, 10. Elsewhere, Plaintiff selectively

excerpts lines from three lengthy videos—lines which themselves contain no advertisements or commercial speech—that it alleges to be "similar claims" to the April 8 video. *See id.* at 10-12.

Plaintiff substitutes sweeping and conclusory generalizations for meaningful analysis. For example, without analyzing any of the 64 items of Disputed Content, Plaintiff contends that "there can be no dispute that Defendants' publications are advertisements." *Id.* at 8. To be clear, this issue involves highly disputed facts and interpretations of those facts which preclude summary judgment. Similarly, Plaintiff generically cites hundreds of paragraphs in its SUF in support of its net impression "argument" that the Disputed Content "expressly claim and clearly imply, among other messages, that: (1) Vitamin D and Zinc are more effective at treating or preventing COVID-19 than the currently available vaccines, *see* SUF ¶¶ 60-490, and (2) Zinc is effective at preventing and treating COVID-19, *see* SUF ¶¶ 491-731." Pl.'s Mem. at 3-4 (a total of 632 paragraphs) (emphasis added). Plaintiff neglects to mention it cherry-picked a few lines of excerpts from videos up to almost 40 minutes in duration and Radio Shows lasting two hours. *See, e.g.*, PX 25, 161, 165, 169. Neither the Court nor the Defendants are reasonably equipped to comb through over 700 paragraphs of purportedly uncontroverted facts to determine whether Plaintiff's analysis of a handful of excerpts can be applied across all of the remaining Disputed Content.

Under both the Federal Rules and Local Rules, Plaintiff's cite-the-whole-record approach is procedurally improper. Plaintiff is required to support all factual positions asserted in their Motion and Memorandum with citations to "particular parts of materials in the record." *See* Fed. R. Civ. P. § 56(c)(1)(A); E.D.Mo L.R. 4.01(E). Plaintiff bears the burden of demonstrating that each fact relied upon in its Motion is uncontroverted. "Simply providing a massive record does not satisfy this burden, and [the Court] will not sort through a voluminous record in an effort to find support for the plaintiff's allegations." *Espinola v. Ingersoll Rand Co.*, No. 4:09CV02090

HEA, 2012 WL 760905, at *1 (E.D. Mo. Mar. 8, 2012); *see also Crossley v. Georgia-Pac. Corp.*, 355 F.3d 1112, 1114 (8th Cir. 2004) (Rule 56 requirements not met where Plaintiff attached entire transcripts as exhibits and his claim could only be understood by reading them in full). The Court need not undertake to "determine Plaintiffs' specific injuries by combing through the record and drawing connections between the evidence and Plaintiffs' arguments." *Rosemann v. St. Louis Bank*, No. 14-CV-983-LRR, 2015 WL 13546678, at *14 (E.D. Mo. Nov. 17, 2015), *aff'd*, 858 F.3d 488 (8th Cir. 2017); *Kutten v. Bank of Am., N.A.*, No. 06-0937 PAM, 2007 WL 2485001, at *11 (E.D. Mo. Aug. 29, 2007) ("The Court will not sift through the record to locate evidence to support her position.").

As the Seventh Circuit colorfully writes, judges are not "like pigs, hunting for truffles buried in briefs." *United States v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991). A brief must make all arguments accessible to the judges, rather than ask them to play archaeologist with the record, reconstituting pottery from shards of clay. *Id.*; *see also, Hunton v. American Zurich Ins. Co.*, 2018 WL 1182552, * 6 (D. Ariz. 2018) (denying a motion for summary judgment which contained a voluminous statement of facts, stating "Lawyers are tasked with bring clarity out of chaos, and voluminous filings rarely do that. Regrettably the briefing in this case has sown more chaos that it has ordered."). Denial of summary judgment is warranted on this ground alone.

Moreover, Plaintiff's arguments are simply not accessible to the Court without extensive review of nearly the entire record. For the reasons discussed in the sections below, the issues of commercial speech and net impression, which Plaintiff seeks to generalize, are core matters in dispute in this case and require detailed factual analysis of the Disputed Content. This analysis cannot be accomplished through cursory arguments that treat each Disputed Statement as though it were identical to all others; nor can it be accomplished through review of the cherry-picked

excerpts in Plaintiff's SUF. Instead, the Court must not only consider Plaintiff's 200-page SUF, but also review each of the 64 videos, emails, and Radio Show broadcasts (collectively totaling over 36 hours of video) individually and in their entirety. This herculean task is just as arduous as a jury trial, would not dispose of all of Plaintiff's claims, is not a "summary" proceeding under any meaning of the term, and provides ample basis for the Court to deny Plaintiff's Motion. *See e.g.*, *Roberts v. Browning*, 610 F.2d 528, 536 (8th Cir. 1979) (finding "sound judicial policy and the proper exercise of judicial discretion" may prompt the Court to deny a motion for summary judgment and "permit the case to be developed fully at trial" even if the standard has been met); *Elliott v. Elliott*, 49 F.R.D. 283, 284 (S.D.N.Y. 1970) ("[Summary judgment] is intended to economize the court's time, and its purpose is totally frustrated if determination of the motion would require as much time as a full trial on the merits.").

## II. Plaintiff Fails to Establish a Lack of Material Dispute as to Core Matters of Fact.

Defendant and the FTC agree upon the basic standard governing liability under the FTC Act and the COVID-19 Act. An advertisement or commercial practice is deceptive under those statutes if: (1) "there is a representation, omission, or practice"; (2) that "is likely to mislead consumers acting reasonably under the circumstances"; and (3) "the representation, omission, or practice is material." *FTC v. Pantron I Corp.*, 33 F.3d 1088, 1095 (9th Cir. 1994). As shown below, there are genuine disputes of material fact as to each of these elements.

### A. Plaintiff Has Not Shown that the Disputed Content are Advertisements.

To demonstrate Defendants' liability under the FTC Act, and thus the COVID-19 Act, Plaintiff must make a threshold showing that each excerpt either was itself an advertisement or appeared within an advertisement. *See* 15 U.S.C. § 45(a)(1) (proscribing "deceptive acts" "affecting commerce"); *id.* at § 52 (prohibiting the dissemination of a false advertisement). The

FTC Act's scope is limited to advertisements because any broader application would create serious First Amendment questions.

Indeed, the "First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Department v. Mosley*, 408 U.S. 92, 95, 92 S.Ct. 2286, 2290, 33 L.Ed.2d 212 (1972). With respect to noncommercial speech, the "Court has sustained content-based restrictions only in the most extraordinary circumstances." *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60, 65, 103 S.Ct. 2875, 2879, 77 L.Ed.2d 469 (1983) (collecting cases). The degree of protection afforded to commercial speech is not to the extent afforded political speech given the potential for deception or confusion. *Id.*

To determine if particular speech is commercial, courts look to whether speech "does no more than propose a commercial transaction," and "is so removed from any exposition of ideas, and from truth, science, morality, and arts in general, in its diffusion of liberal sentiments on the administration of Government that it lacks all protection." *Virginia State Bd. of Pharmacy v. Virginia Citizens Cons. Council, Inc.*, 425 U.S. 748, 762 (1976). In fact, the mere fact that a statement is contained within an advertisement does not compel the conclusion that the statement is commercial speech. *See New York Times v. Sullivan*, 376 U.S. 254, 265-66, 84 S.Ct. 710, 718-19, 11 L.Ed.2d 686 (1964). Even referencing a product does not make an advertisement *per se* commercial speech. *Bolger*, 463 U.S. at 67. Nor does whether a party has economic motivation for making the statement. *Id.* (collecting cases). The government bears the burden of demonstrating that the speech it seeks to prohibit is an advertisement beyond First Amendment protections. *Fed. Trade Comm'n v. Affiliate Strategies, Inc.*, No. 09-4104-JAR, 2010 WL 11470103, at *9 (D. Kan. June 8, 2010).

Plaintiff fails to carry its burden of showing that all 64 items of Disputed Content were "advertisements" under the FTC Act and strictly commercial speech, rather than protected speech. Plaintiff addresses this point in only a single paragraph of its Memorandum. *See* Pl's Mem. at 8. In doing so, Plaintiff does not look to the substance of the Disputed Content. Instead, the entirety of its evidence is that (a) Quickwork was formed, in part, for the purpose of the "marketing, sale and distribution of vitamins and related products" and (b) that "alongside their claims" Defendants directed consumers to websites where they could purchase vitamins. *Id*.

This argument is unconvincing for several reasons. First, Quickwork's status as a company is not dispositive of the nature of the speech. While it is true that Quickwork distributes vitamins, it does so as part of its overarching goal "to make more people less sick" as stated on its website and repeated in Defendants' content. DX M (Wood Tr.) at 58:22-59:3. In support of this larger goal, Quickwork publishes a variety of educational materials on its webpage, including a "Blog" section that covers such topics as self-improvement, "life hacks", food and drink, and healthy recipes. DSUF 16. Additionally, the website contains a "masterclass" on health topics and a series of tutorials on such diverse issues as microplastics and GMOs. DSUF 17. Thus, that certain portions of the Disputed Content directed listeners back to Quickwork's website is not irrefutable evidence that the Content was commercial in nature. In fact, in many cases, listeners were directed to the Quickwork website for the express purpose of providing further health information. *E.g.* SUF ¶¶ 66, 76, 138. Because Quickwork's website does more than simply propose a commercial transaction and is interconnected with the exposition of ideas about how to live a healthy life, the references to it in the Disputed Content do not make them *per se* advertisements. Moreover, as is the case throughout its brief, Plaintiff's cursory and conclusory "argument" would require the

Court to go through each of the 64 videos, emails, and Radio Shows to determine whether they constitute advertisements, in whole or in part.

Second, many of the excerpts (regarding zinc, vitamin D, and COVID-19) are separated in time and position from any references to Quickwork's website or other commercial speech. For example, Plaintiff identified Dr. Nepute's February 21, 2022 radio show as an advertisement. But this radio program consisted of a variety of topics, including Canada's political response to the truck protest through Canada's Emergencies Act. Transcripts from the Canadian Parliament were even broadcasted during Dr. Nepute's radio program. Not once did Dr. Nepute mention Wellness Warrior during his live radio program. PX 92. As seen in Plaintiff's SUF, Plaintiff seemingly tries to link the political discourse of the show to one or two generic Wellness Warrior commercials – commercials that do not even mention COVID - aired during a break. It beggars belief that the entirety of this content, which spans a variety of non-commercial topics, is advertising falling within the FTC Act or COVID-19 Act.

To the extent portions of Defendants' videos, emails, and radio show that reference the website could be construed as an advertisement, Plaintiff failed to provide the Court with a meaningful basis to conclude that the limited excerpts appeared in those portions. In fact, Plaintiff's SUF is drafted in such a way as to prevent the Court from reasonably assessing the proximity of Defendant's purportedly commercial speech (i.e., their references to the Quickwork website or Wellness Warrior) and Dr. Nepute's alleged misstatements concerning zinc and the COVID-19 vaccine.

Third, the Disputed Content, particularly those related to the governmental response to the COVID-19 pandemic (e.g., lockdowns, social distancing policies, the issuance of an EUA for vaccines, and vaccination mandates) are infused with political speech on topics of substantial

controversy. This speech, though perhaps controversial, falls within the core of the First Amendment and is entitled to the highest level of constitutional protection. *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 422, 112 S.CT. 2538, 2564, 120 L.Ed.2d 305 (1992) (Scalia, J., concurring) ("Our First Amendment decisions have created a rough hierarchy in the constitutional protection of speech. Core political speech occupies the highest, most protected position…."). If Plaintiff's position is accepted, then healthcare professionals who recommend or sell general wellness products—like Dr. Nepute—will have their speech chilled on important matters related to politics and healthcare policy for fear of unintentionally making statements that could result in liability. As relevant here, Plaintiff alleges that nearly every statement made by Dr. Nepute regarding the efficacy or safety of the COVID-19 vaccine constitutes not only an advertisement, but also a punishable comparative efficacy claim between zinc, vitamin D, and the vaccine. Of course, Dr. Nepute individually or through Quickwork does not sell vaccines or any product that competes with vaccines. DX C (Nepute Decl.) at ¶ 12. Plaintiff, in effect, seeks to prevent Dr. Nepute from stating opinions on the vaccine simply because he **also** provides healthcare products services. The chilling effect of such actions is readily apparent and odious to the First Amendment. The First Amendment does not permit the government to enforce an orthodoxy of opinions. *United States v. Alvarez*, 567 U.S. 709, 728 (2012) ("Our constitutional tradition stands against the idea that we need Oceania's Ministry of Truth.").

### B. Plaintiff Fails to Establish that the Disputed Content's Net Impression is Factually Indisputable.

Even were the Court to conclude that the Disputed Content were all advertisements, by relying on only limited, cherry-picked excerpts, Plaintiff fails to establish that there are no disputed facts as to the overall net impression from the entirety of the Disputed Content.

"The first step that the court must take to analyze whether defendants violated the FTC Act is to determine whether the advertisement made the claims asserted by the FTC in the complaint." *F.T.C. v. Nat'l Urological Grp., Inc.*, 645 F. Supp. 2d 1167, 1189 (N.D. Ga. 2008), *aff'd*, 356 F. App'x 358 (11th Cir. 2009). "The test under the [FTC Act] is whether the net impression created by a solicitation, <u>viewed as a whole rather than as individual parts</u>, is deceptive." *Keithly v. Intelius Inc.*, 764 F. Supp. 2d 1257, 1266 (W.D. Wash. 2011) (emphasis added); *see also Beneficial Corp. v. Federal Trade Comm'n*, 542 F.2d 611, 617 (3d Cir. 1976) ("[T]he tendency of the advertising to deceive must be judged by viewing it as a whole, without emphasizing isolated words or phrases apart from their context."); *see also*, FTC Policy Statement on Deception, 103 F.T.C. 110 (1984). At summary judgment the Court "cannot rely solely on the representations of the FTC … as to what the [statements] represent." *F.T.C. v. Johnson*, 96 F. Supp. 3d 1110, 1121 (D. Nev. 2015). The Court must itself review the statements "in the light most favorable to the Defendants and draw all inferences in Defendants' favor, in order to understand the representations made and whether the sites create a net impression that is deceptive." *Id.*

An advertisement's net impression is often proved via extrinsic evidence or expert testimony. *See e.g., Id.* (relying on an expert "who analyzed 125 websites provided to him by the FTC and gave his opinion as to the consumer experience"). Plaintiff offers no such evidence, so it must demonstrate the claims are "clear and conspicuous from the face of the advertisement." *Nat'l Urological Grp.*, 645 F. Supp. 2d at 1189.

The question for the Court is whether the Disputed Content on their face, and when viewed in their entirety in the light most favorable to Defendants, create a clear and conspicuous net impression that "(1) Vitamin D and Zinc are more effective at treating or preventing COVID-19 than currently available vaccines, and (2) Zinc is effective at preventing and treating COVID-19."

Pl.'s Mem. At 3-4. Even a passing look at the cited excerpts yields substantial grounds to doubt Plaintiff's interpretation. For example, many of the excerpts contain no express comparisons between the efficacy of COVID-19 vaccines and zinc or vitamin D. At most, the excerpts simply offer an opinion about the vaccine (including its potential to cause serious adverse effects—which is not the basis of Plaintiff's claims) in some proximity to general statements regarding the health effects of zinc and/or vitamin D. For example, the entirety of the excepts Plaintiff pulls from one "vaccine comparison" email is the following:

> a. "Was COVID a naturally occurring [sic] virus or MAN-MADE? Has our government covered up the best treatment options just to help BIG PHARMA get a VAX? It's why you MUST WATCH THIS. I'm going to answer those questions and expose the corruption so make sure you WATCH it and SHARE it before it gets removed." *Id*. at 31.
>
> b. "If you haven't already gotten it I'm going to throw in a FREE bottle of D3 and Zinc with it (which I'm calling my PATRIOT Health Pack)." *Id*. at 31.

SUF Resp. ¶ 204. There is no comparison, express or implied, between vitamin D/zinc and the COVID-19 vaccines. Rather, there is a question about the SARS-CoV-2 virus's origin followed with boilerplate promotional language. Yet, on the basis of this supposed net impression, Plaintiff seeks over 270,000 violations of the COVID-19 Act (and thus up to $12.7 million in civil penalties). *Id*. at ¶ 211. Making this overreach even more egregious, the Click Funnel software that Plaintiff repeatedly uses to support how many times Quickwork's emails were allegedly "opened" states that this particular email was not opened by any recipient. PX 48. To paraphrase a famous rhetorical question, is there a net impression if no one is there to read it?

Moreover, Dr. Nepute consistently told listeners to get the COVID-19 vaccine if they desired, but to do so with informed consent and/or after speaking to their physician. *See e.g.*, SUF Resp. ¶¶ 79, 114, 177, 353, 378, 403, 416, 431, 438. He also never stated zinc/vitamin D and vaccines were mutually exclusive alternatives, rather he offered vitamin supplementation as an

option irrespective of vaccination status. When viewed in the context of their entirety, and not the limited excerpts cited by Plaintiff, there are unquestionably disputes of fact as to the net impression of the 64 videos, emails, and Radio Shows. *See F.T.C. v. Connelly*, No. SACV 06-701 DOC RNBX, 2006 WL 6267337, at *11 (C.D. Cal. Dec. 20, 2006) (denying judgment in part because "Defendants are entitled to present evidence as to other statements that may alter the net impression").

The same can be said of the cited excerpts related to the efficacy of zinc. These statements extol the uncontroverted benefits of zinc supplementation to help the immune system achieve an optimal anti-viral response, including inhibiting viral replication and preventing cytokine storms (and the resulting ARDS, a leading cause of death in COVID-19 patients). They do not include explicit or implicit claims that zinc is effective in treating COVID-19.

As shown below, these types of claims are well substantiated in academic literature and the NIH website. Similar to the cited excerpts related to the COVID-19 vaccine, the zinc excerpts also contain disclaimers that zinc does not treat or cure COVID-19. *See e.g.*, DX W (freevitamindeal.com/special-offer (last visited November 3, 2022); *see* also PX 45 (stating in regard to taking zinc supplements, "Now does this mean that you can't get '[COVID-19]' no"). These disclaimers are pervasive, and clearly relevant to the Court's analysis, but are not cited by Plaintiff in its Memorandum or Statement of Facts.

As the examples cited above demonstrate, the Disputed Content, when viewed in their entirety, convey a substantially more nuanced picture of vitamin D, zinc, and the COVID-19 vaccine than is depicted by Plaintiff's excerpts. Yet Plaintiff seeks to summarily assign liability to Defendants based on analysis of a few brief excerpts from the Disputed Content and a bare

assertion that "Defendants made similar claims in at least 64 videos, emails, and radio shows." *See* Pl.'s Mem at 4-5, 10-12.

This method—analyzing a handful of excerpts and then seeking to generalize that analysis to a wide array of others—has been rejected elsewhere. For example, in *F.T.C. v. DIRECTV, Inc.*, the Northern District of California was asked to determine the net impression of thousands of purportedly similar advertisements after the FTC and its experts had submitted extrinsic evidence purportedly demonstrating that three "sufficiently representative" advertisements conveyed a misleading net impression. No. 15-CV-01129-HSG, 2018 WL 3911196, at *7 (N.D. Cal. Aug. 16, 2018). The court first found that the FTC had not shown that the representative advertisements created a misleading net impression. *Id.* at * 15. Next, the Court determined that even had the FTC made such a showing, it "failed to show how that impression is generalizable to hundreds or thousands of additional advertisements." *Id.* Though the FTC's experts had testified to the advertisements' similarity, the Court found that variation in those ads with respect to "tactics, page count, content" and the "frequency, placement, and manner" of curative disclosures prevented it from applying a single net impression across all the ads. *Id.* The FTC could not meet it s burden of demonstrating a uniform net impression by "characterizing the advertisements at a high level of generality and asserting that conclusions regarding one advertisement apply uniformly . . . ." *Id.* at 16.

Short of reviewing each Disputed Statement in its entirety, the Court cannot appropriately assess whether Plaintiff's interpretation of these Statements is "clear and conspicuous" on their face. In effect, to rule on summary judgment here, the Court would be required to duplicate the entirety of a trial on the merits (which must occur regardless on Plaintiff's claims related to vitamin

D efficacy). Under these circumstances, summary judgment is not "summary" at all, and it thus inappropriate. *Roberts*, 610 F.2d at 536.

### C. Plaintiff Has Not Shown as a Matter of Law that the Disputed Content Lacked Adequate Substantiation.

Assuming *arguendo* that Dr. Nepute made efficacy claims, Plaintiff must establish that the claims were either false, or that Defendants lacked a reasonable basis.[7] *See Johnson*, 96 F. Supp. 3d at 1120. Plaintiff foregoes a falsity theory and instead pursues a reasonable basis theory. While Defendants must initially identify their substantiation, Plaintiff bears the burden of demonstrating that the substantiation is inadequate. *See Id.*

Here, regarding zinc, Defendant identified the various scientific articles that supported Dr. Nepute's statements. Plaintiff does not contend that this evidence, i.e., Dr. Parks and Dr. Nepute's testimony, if admitted, is insufficient to create a question of fact as to the substantiation of the Disputed Content regarding zinc.[8] Instead, in a classic shoot the messenger and not the message,

---

[7] It is not clear from the briefing which theory Plaintiff intends to pursue in this case. However, their discussion of the evidence related to the efficacy of zinc, vitamin D, and the COVID-19 vaccine is phrased in terms of the substantiation standard and does not allege that any statements were actually false. Pl.'s Mem. at 6, 11, 12.

[8] Defendant has extensively briefed this issue of substantiation for zinc efficacy in relation to Plaintiff's motion to exclude the testimony of Dr. Christina Parks and Dr. Nepute. Dr. Parks testifies that competent and reliable scientific evidence supports claims regarding (1) role and benefit with respect to immune system function, including the relevant biological mechanisms; (2) impact on the immune system's antiviral response, including inhibiting viral replication; (3) ability to reduce the likelihood of developing COVID-19 symptomology; and (4) potential to improve outcomes in COVID-19 patients. Dr. Nepute provides similar testimony, identifying the biological mechanisms by which zinc improves anti-viral immune response (e.g., inhibiting viral replication, preventing cytokine storms) and studies demonstrating improved patient outcomes. Dft's Mem. Opp. Mot. Exclude, at 2-9.

Whether or not the evidence and the voluminous scientific material relied on by Drs. Parks and Nepute is substantiated is irrelevant for purposes of Plaintiff's motion because its position is hinged on the exclusion of the expert's testimony. Plaintiff waived the argument regarding the level of substantiation required and/or whether such material relied on by Dr. Nepute when making such statements is substantial by failing to raise them in its initial brief. *See e.g., Fish v. United*

Plaintiff's argument hinges upon this testimony being excluded in its entirety. Pl.'s Mem. at 6. For the reasons stated fully in Defendants' Opposition to Plaintiff's Motion to Exclude, Plaintiff has failed to carry its burden to exclude Dr. Parks' and Dr. Nepute's testimony and, as a result, Plaintiff fails to carry its burden here.

Second, Plaintiff argues that Defendants have presented no substantiation for claims that vitamin D or zinc can prevent or treat COVID-19 more effectively than the vaccines. Pl.'s Mem. at 6. Defendants need not present such substantiation because the Disputed Content, when viewed in context and not through isolated excerpts, do not convey a net impression of comparative efficacy between zinc, vitamin D, and vaccines. *See* Section II.B, *supra*.

While it is true the Disputed Content does include some discussion by Dr. Nepute of the COVID-19 vaccine's side effects and lack of efficacy, these statements, which are not comparison statements, are adequately supported. In particular, Dr. Nepute's statements regarding COVID-19 vaccine safety have been validated by multiple state and federal government actions, including the pause on the administration of the Johnson & Johnson vaccine due to blood clots and, more prominently, the Florida Department of Health's October 2022 guidance that "**now recommends against the COVID-19 mRNA vaccines for males ages 18-39 years old**." *See* DX Z.

If the Court were to find that Defendants made efficacy comparisons between vitamin D/zinc and the COVID-19 vaccines, the factual record is more than sufficient to allow Dr. Nepute to explain the basis for these statements from a risk/benefit analysis. DX B (Nepute Tr.) at 173:6–185:24. The vaccines' efficacy record is, at best, mixed. So called "break-through" infections are

*States*, 748 Fed.Appx. 91, 92 (8th Cir. 2019); *McGhee v. Pottawattamie County, Iowa*, 547 F.3d 922, 929 (8th Cir. 2008); *Bayes v. Biomet, Inc.*, 2021 WL 3330911, *8 (E.D.Mo. 2021).

relatively commonplace in the vaccinated. DSUF ¶¶ 51-54. While initially touted to prevent infection and thus the transmission and spread of COVID-19, the CDC has shifted its guidance in the fact of real-world data, and its guidance now emphasizes the vaccines' ability to prevent serious illness:

> COVID-19 vaccines help protect against severe illness, hospitalization and death. COVID-19 vaccines also help protect against infection. People who are vaccinated may still get COVID-19. When people who have been vaccinated get COVID-19, they are much less likely to experience severe symptoms than people who are unvaccinated.

DSUF ¶ 53; *see also* DX E; DX F.

In particular, Dr. Nepute's statements regarding COVID-19 vaccine safety have been validated by both the reported data and the resulting state and federal actions. Reporting of adverse effects in VAERS for the COVID-19 vaccines was greater in the first 18 months it was available than all other vaccines in the past 30 years. DSUF ¶¶ 55-56. Indeed, the adverse effects reporting data showed a tenfold increase in the number of reported adverse effects for the COVID-19 vaccines as compared to flu vaccines. DSUF ¶ 56.

Concerns over the Johnson & Johnson ("J&J") vaccine causing potentially fatal blood clots led to its use being temporarily suspended in April 2021. DSUF ¶ 61. Persisting concerns over blood clots, however, led the FDA in May 2022 to restrict the J&J vaccine to only those adults who cannot receive other forms of vaccination. DSUF ¶ 62. Concerns as to the mRNA vaccines also exist. The Florida Department of Health's analysis showed that males 18-39 years old experienced "an 84% increase in the relative incidence of cardiac-related death" following mRNA vaccination and therefore issued guidance in October 2022 that "**now recommends against the COVID-19 mRNA vaccines for males ages 18-39 years old**." DSUF ¶¶ 57-60. On this record, Plaintiff cannot be entitled to summary judgment.

### D. Issues of Fact Precludes Summary Judgment as to Quickwork's Emails.

Plaintiff seeks to impute Quickwork's solely on one of its members – Dr. Nepute. In particular, Plaintiff alleges Dr. Nepute directly participated in or had the authority to control three distinct modes of alleged unlawful advertisements: the social media videos, the radio show, and the emails. Plaintiff argues the Dr. Nepute is individually liable for the Quickwork emails because he purportedly participates in or has the ability to control all of Quickwork's allegedly unlawful advertisements. (Plf's Mem. at 13). In order to hold Dr. Nepute liable for Quickwork's liability, the FTC must demonstrate just that – that he either participated directly in the deceptive acts or practices or had authority to control them. *F.T.C. v. Direct Mkg. Concepts, Inc.*, 569 F. Supp. 2d 285, 310 (D. Mass. 2008), *aff'd*, 624 F.3d 1 (1st Cir. 2010). While Dr. Nepute concedes that he created the social media videos which were later shared by others[9] and that he hosts[10] a radio show that delves into a variety of topics, at no point did Dr. Nepute either participate directly in or had the authority to control the content of the emails.

It is undisputed that Dr. Nepute did not create or even have ability to create the emails in question. Quickwork, a three-member manager limited liability company was created to handle, among other items, the marketing of the Wellness Warrior product. Quickwork only had three employees – Dr. Nepute, Ryan Jaycox, and Pastor Joseph Woods. Consequently, Quickwork entered into a contract with Jaycox Brands, LLC. Mr. Jaycox signed on behalf of Jaycox Brands

[9] Indeed, Mr. Jaycox testified that Dr. Nepute had been creating videos for "a long time" DX D (Jaycox Tr.) at 172:3-16. Quickwork saw the educational videos that Dr. Nepute created and sought to share their educational content. *Id*.

[10] Again, while Dr. Nepute may host a radio show he does not possess the ability to control its distribution or marketing of this radio program. The radio owner owns the content and controls the marketing of the show and its placement on social media formats. The radio program is not an advertisement or commercial.

while Pastor Woods signed on behalf of Quickwork. Jaycox Brands supplied the contract labor for customer service, shipping and receiving, social media, and the "creative department". DX D (Jaycox Tr.) at 35:1-10. The sole owner of Jaycox Brands, LLC is Jaycox Enterprises; the sole owner of Jaycox Enterprises is Ryan Jaycox DX D (Jaycox Tr.) at 37:1-5. A Jaycox Brands employee, Ellie Marsh, was charged with the social media tasks for the Quickwork account. *Id*. at 37:19-38:3. Pastor Joseph Wood, though, was in charge of drafting the emails which were sent to customers. *Id*. at 47:1-10. Thus, the emails in question were created by Pastor Wood and/or Jaycox Brands employees or both.

Dr. Nepute never viewed the emails in question prior to their disbursement nor created their content. Dr. Nepute was not even aware when the emails were sent or to whom they were sent. Dr. Nepute did not even have access to the email account that sent the emails in question. The emails were not sent to Dr. Nepute for approval prior to them being sent to the subscriber list. Instead, Dr. Nepute created the education content found in the videos.

Nonetheless, Plaintiff now seeks to hold Dr. Nepute personally liable for the content of the emails he had never seen or vetted; for emails that he had no control over their content; and for emails created by third parties. Mr. Jaycox described the corresponding videos referenced in the emails as educational. DX D (Jaycox Tr.) at 172:1-2. But the substance of these videos is unknown as Plaintiff failed to identify the videos created by Dr. Nepute that these emails are allegedly based on. Indeed, the videos attributed to Dr. Nepute in the motion for summary judgment are seemingly divorced from the emails cited in it. In other words, while Plaintiff argues that the emails are based on content created by Dr. Nepute, Plaintiff does not connect the alleged offending videos referenced in its motion to the alleged offending emails. Failing to make this vital connection leaves a question of fact of whether Dr. Nepute contributed anything to the emails.

Just because he is a member of Quickwork does not make Dr. Nepute *de facto* liable for the actions of Quickwork and Jaycox Brands. Quite simply, the emails were created by Jaycox Brands and/or Pastor Woods. Dr. Nepute neither participated directly in the making of the emails or had authority to control them. Thus, he cannot be held liable for the actions of Quickwork as they relate to the emails. At a minimum, a question of fact remains as to the extent of his authority making summary judgment inappropriate.

## III. Plaintiff Has Not Carried its Burden to Show that Civil Penalties are Appropriate or that Defendants Violated the COVID-19 Act 10,175,234 times.

### A. Undisputed Evidence Demonstrates that Defendants Lacked the Requite *Mens Rea* for Civil Penalties

As the culmination of its Motion, Plaintiff requests that the Court find Defendants liable for civil penalties for 10,175,234 violations of the COVID-19 Act. To impose liability for civil penalties, Plaintiff must demonstrate both that Defendants violated the Act and that they did so "with actual knowledge or knowledge fairly implied on the basis of objective circumstances." *See* 15 U.S.C. § 45(m)(1)(A). Plaintiff has not produced any evidence that Defendants acted with actual knowledge that their conduct violated the COVID-19 Act. Instead, Plaintiff contends that, because Dr. Nepute received knowledge of the FTC Act in May 2020, he necessarily had implied knowledge of the passage of the COVID-19 Act on December 27, 2020. Pl.'s Mem. at 14. Plaintiff further argues that "at the very latest" Dr. Nepute received knowledge of the COVID-19 Act on March 30, 2021, when his attorney received an FTC letter enclosing the Act. *Id.* at 15.

For the reasons set forth in Defendants' cross-motion for partial summary judgment, these arguments are meritless as a matter of law. [ECF No. 84] at 3-9. Defendants summarize those arguments only briefly here. First, Plaintiff does not seek civil penalties under the FTC Act, only the COVID-19 Act. Thus, the FTC's May 2020 letter (which predates the passage of the COVID-

19 Act by over six months) is irrelevant as to Dr. Nepute's knowledge of the COVID-19 Act. The undisputed facts are that, at the earliest, Dr. Nepute learned of the COVID-19 Act after the March 30, 2021 letter. Second, the FTC's March 30, 2021 letter enclosed only the Act and failed to identify any particular conduct that the FTC alleged violated the COVID-19 Act, as typically required for a finding of implied knowledge. *See United States v. Hopkins Dodge, Inc.*, 849 F.2d 311, 314 (8th Cir. 1988). PX 18. Upon the filing of Plaintiff's Complaint on April 16, 2021, Defendants quickly began negotiating entry of a Consent Order that governed the prompt removal of the Disputed Content. Plaintiff does not allege that any purportedly misleading statements remained on a Quickwork website or social media page or were transmitted via email by Jaycox Brands/Quickwork following the Consent Order.

The only post-Consent Order conduct raised by Plaintiff is fifteen episodes of Dr. Nepute's radio show and two videos (June 10, 2021 and July 5, 2021) that were found on the Nepute Wellness Center Facebook page. In the eleven-minute June 10, 2021 video, Plaintiff alleges that Dr. Nepute's citation to a study which shows that hydroxychloroquine and zinc can minimize the severity of disease was unlawful. In this video Dr. Nepute focuses on the suppression of medical information and lawsuits filed by activists to stop vaccine mandates, not the study cited by Dr. Nepute. PX 136. He even stated that if someone wanted to get the vaccine, they should as it is their right to do so. *Id*. In the July 5, 2021, video Dr. Nepute discusses whether Americans are "truly free" and the effects of information suppression. In this same video, Dr. Nepute further discusses lockdowns and other instances of his speaking tour. Even though he does not discuss the sale of the Wellness Warrior products, at the very end of his video, during his signoff he mentioned his website to learn more information, which Plaintiff alleges is unlawful. And as mentioned earlier, a wide range of topics are discussed on Dr. Nepute's radio shows – whose content is owned and

distributed by third parties under which Dr. Nepute has no control. The conversations, be it the two Facebook videos and/or radio programs, are politically charged and are not advertisements for a Wellness Warrior product in any way, shape, or form. Nonetheless, Plaintiff wishes to transform 17 videos and/or radio programs to 208,513 violations based on the number of viewers.[11]

Based on these indisputable facts, it is Defendants who are entitled to summary judgment as to civil penalties, not Plaintiff.

**B. Even if Civil Penalties Were Appropriate, Plaintiff has Not Demonstrated 10,175,234 Violations of the COVID-19 Act.**

Under the FTC Act, civil penalties are available for knowing "violations" of rules and cease and desist orders respecting unfair or deceptive acts or practices. *See* 15 U.S.C. § 45(m)(1)(A). Plaintiff contends that when the Court assesses the number of violations encompassed by the Disputed Content in this case, it should look to how many times a video or radio show was viewed and how many individuals received emails. Pl.'s Mem. at 15. Defendants have not located any support in case law for this outrageous position, nor does Plaintiff cite any. *See id*. The effect of this position would be to impose civil penalties based on "violations" that are orders of magnitude larger than the number of actual statements or advertisements at issue. A single video, if posted on the right website or social media page could create millions of violations, as could a single radio or television broadcast on a popular show. Here, Plaintiff seeks to turn the 64 instances of Disputed Content into more than 10 million "violations" for which the maximum civil penalty is over half-a-trillion dollars.

[11] Such a standard would turn the law upside down as violations would be based on viewership, not on the number of "ads" placed/stations owned. *CBS Corp. v. F.C.C.*, 663 F.3d 122 (3d Cir. 2011) (though overturned, the initial penalties were based on the number of stations owned, not on the viewership metrics of the Super Bowl where the conduct occurred).

The FTC Act simply cannot support this interpretation. The Act consistently uses the term violation to refer to a single act committed by a liable "person, partnership, or corporation." *See* 15 U.S.C. § 45(m)(1)(A) ("The Commission may commence a civil action to recover a civil penalty in a district court of the United States against <u>any person, partnership, or corporation which violates</u>. . . ." (emphasis added)). Such language is inconsistent with the idea that a violation could occur through an act committed by someone other than by the liable entity (i.e., through a third-party viewing a purportedly misleading statements). The FTC Act's requirement that violations be knowing in order to trigger civil penalties is also irreconcilable with Plaintiff's position. *See id.* An individual, of course, cannot be said to have knowingly violated the rule through the uncontrolled conduct of another party. Finally, were Plaintiff permitted to multiply "violations" by calculating them based on views rather than statements, the FTC Act's cap on the amount of civil penalties awardable would be rendered a nullity.

Even were the Court to interpret the FTC Act as permitting separate assessment of civil penalties for each time a Disputed Statement was viewed, Plaintiff fails to provide evidence sufficient to support its contention that the Statements were viewed 10,175,234 times. The vast majority of Plaintiff's evidence derives from "view counts" compiled by Facebook. *See e.g.* SUF ¶¶ 82, 94, 106, 118, 358, 369, 387, 407, 421, 443, 456, 487, 695, 706, 717, 728. For emails, Plaintiff calculates the number of views based on the number of email addresses in the Quickwork subscriber list or by data reported by Click Funnels, the software used to manage the subscriber emails. *See e.g.* SUF ¶¶ 26, 211, 590. Neither of these methods is reliable. (Facebook) *see* SUF RSP. ¶¶ 82, 94, 106, 118, 358, 369, 387, 407, 421, 443, 456, 487, 695, 706, 717, 728; DX L; DX P; DX Q; (Click Funnels) *see* SUF RSP. ¶¶ 26, 211, 590; DX M (Wood Tr.) at 161:12-162:22.

Facebook calculates view counts based on the total number of users for whom a video played for three seconds or more. DSUF ¶ 23. These counts do not indicate that a user intentionally played, much less watched the video. *Id*. Depending on a user's setting and what type of device is being used, videos can "auto-play" without any action by the user. DSUF ¶ 24. When auto-played, videos often play without sound. *Id*. Unless the user presses the stop button within three seconds, Facebook would count this automated play as a view. DSUF ¶ 23.

Plaintiff's reliance on Facebook view counts is therefore misplaced for numerous reasons. At the very least, the view count does not give an accurate picture of the number of people who actually chose to interact with a video and viewed it, with sound, for any meaningful amount of time—much less for the extended duration necessary to have viewed the cherry-picked excerpts from the Disputed Content. *See, e.g.*, PX 80 (first excerpt [SUF ¶ 377.a] is 1 hour, 19 minutes and 34 seconds into the video); PX 106 (first excerpt [SUF ¶ 451.a] is 1 hour, 57 minutes and 17 seconds into the video); PX 76 (first reference to website [SUF ¶ 362.a] 1 hour, 17 minutes and 58 seconds into the video). The Facebook view counts are not a sufficient basis to conclude whether the excerpts were ever actually heard or whether they were heard alongside an "advertisement." Facebook likely maintains more detailed analytics about how users interact with videos, but Plaintiff chose not to subpoena such data.

Plaintiff's reliance on the Click Funnels data and Quickwork subscriber list as evidence of violations is similarly flawed. These subscriber lists provide insight into how many email addresses a given email was sent to, not how many individuals actually received, much less read, the content of the email. DSUF ¶ 34. As for the Click Funnel data upon which Plaintiff relies, Plaintiff pointedly avoids admitting that in some instances, none of the emails were reported as "opened." *See e.g.* SUF ¶¶ 211, 590. Further, even for those emails that are counted as "opened,"

all this means is that the email content was viewable in the reader pane of an email browser—it does not mean that a user took any volitional act (i.e., "clicking" on the email to open it), much less read the email. DSUF ¶ 35. Furthermore, the Click Funnel data itself shows how generally ineffective mass emails are in generating audience engagement. *See e.g.* PX 48; PX 142 (wherein Click Funnels calculated these emails—which were sent to 271,728 and 177,257 email addresses respectfully—were opened **zero times** and thus were not read.).

## CONCLUSION

For all of the foregoing reasons, numerous genuine disputes of fact and the interpretation of those facts preclude summary judgment.

Dated: November 9, 2022 Respectfully submitted,

McCARTHY, LEONARD &
KAEMMERER, L.C.

By: /s/ S. Jay Dobbs ___________
Brian E. McGovern, #34677
S. Jay Dobbs, #40859
Bryan M. Kaemmerer, #52998
825 Maryville Centre Drive, Ste. 300
St. Louis, Missouri 63017
bmcgovern@mlklaw.com
jdobbs@mlklaw.com
bkaemmerer@mlklaw.com

*Attorneys for Eric Anthony Nepute*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 9, 2022, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's electronic filing system to all counsel of record.

/s/ S. Jay Dobbs

Plaintiff's motion must be denied.